Noland BLASS, Sr., as Executor of the Estate of Mrs. Joe (Essie B.) Berger, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Noland BLASS, Jr., and Elizabeth W. Blass, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Gus BLASS, II, and Patricia B. Blass, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Nos. LR-70-C-186 to LR-70-C-188.

United States District Court, E. D. Arkansas, W. D.

April 24, 1972.

Frank J. Wills, Little Rock, Ark., for plaintiffs.

W. H. Dillahunty, U. S. Atty., Eugene Sayre, Tax Division, Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

EISELE, District Judge.

This consolidated case was tried to the Court on September 23, 1971. As the trier of fact, the Court is called upon to determine the fair market value of the common stock of the Gus Blass Company as of: (1) the latter half of 1916; (2) January 15, 1919; and (3) July 14, 1920.

Most of the facts were entered into evidence by way of a stipulation filed September 13, 1971. In addition, the plaintiffs relied upon the testimony of Mr. Noland Blass, 82 years of age, who was associated with the Gus Blass Company from 1910 until his retirement in 1950. The government relied principally upon the testimony of an evaluation analyst by the name of Mr. John A. Carrick and certain documentary evidence.

The stock in question was sold by the various plaintiffs in the year 1964, and this action to recover income taxes paid by the plaintiffs was necessary because the parties could not agree as to the proper basis, for federal income tax purposes, of the stock in question.

In determining whether a taxpayer realizes gain or loss on the sale of a capital asset which he has acquired by gift, Section 1015(c) of the Internal Revenue Code of 1954 provides that the taxpayer's basis will be the fair market value of the property at the time of its acquisition if that property was acquired prior to December 31, 1920.

Revenue Ruling 59-60 sets forth the approach required in the determination of the fair market value of stock in closely held corporations. Section 3.01 sets forth the general approach as follows:

"A determination of fair market value, being a question of fact, will de-

pend upon the circumstances in each case. No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often, an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, he should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science. A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance."

The other subsections of Section 3 point out that fair market value will vary as general economic conditions change, that is, "according to the degree of optimism or pessimism with which the investing public regards the future at the required date of appraisal". Some judgment must be made as to the degree of risk attaching to the business. The revenue ruling also points out that valuation of securities is "in essence, a prophecy as to the future", but this prophecy must be based upon facts available at the critical date. Where the stock is not traded, or is traded infrequently, "the next best measure may be found in the prices at which the stock of companies engaged in the same or a similar line of business are selling in a free or open market". This approach, of course, assumes that such information is available as to "similar" or comparable businesses at the critical valuation dates. Section 4.01 sets forth the "factors to consider" as follows:

"(a) The nature of the business and the history of the enterprise from its inception.

"(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend-paying capacity.

"(f) Whether or not the enterprise has goodwill or other intangible value.

"(g) Sales of the stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter."

Section 5 of the revenue ruling sets forth the "weight to be accorded various factors" and Section 6 sets forth the "capitalization rates" to be used in the application of certain fundamental valuation factors such as earnings and dividends. In deciding upon the rate to be used, Section 6 emphasizes the following as important factors: "(1) the nature of the business; (2) the risk involved; and (3) the stability or irregularity of earnings".

Although the Court may not be required to follow exactly the approaches suggested in the revenue rulings, it has in fact done so because it is of the opinion that that approach is a reasonable one which any competent appraiser would generally follow in attempting to establish the fair market value of stock in closely held corporations.

Mr. Noland Blass, after setting forth the history and background of the Gus Blass Company in relation to the department store industry in general, with particular emphasis on the period from 1910 until 1920, concluded that the 1916 valuation per share of common stock of the Gus Blass Company (having been adjusted to take into consideration stock splits and stock dividends so as to make it comparable with the per share situation existing in 1964), on a fair market basis, amounted to $49.80; that said valuation for January 15, 1919, amounted to $55.01 per share; and that such valuation as of July 14, 1920, amounted to $66.10 per share. Upon the basis of these valuations, the total common stock

value would have been $2,241,461.00 on the 1916 date; $2,475,443.00 on the 1919 date; and $2,529,460.00 on the 1920 date.

Mr. Carrick gave his opinion that the fair market value on the 1916 date was $22.37; on the 1919 date $13.63; and on the 1920 date $31.11. The total value of the shares, according to his testimony, therefore came to $1,006,650.00 with respect to the 1916 date; $613,350.00 with respect to the 1919 date; and $1,399,950.00 with respect to the 1920 date.[1]

The Court was impressed with the testimony of Mr. Noland Blass and with his vivid recollection of the pertinent events during the period under consideration, although it does not agree with his opinion as to the valuation of the stock or with the precise method used by him in arriving at such valuations. The Court discounts considerably the case for the government because of the superficiality of its approach and its failure to establish the comparability of the data upon which it relied. In particular, the Court finds no valid justification for the government's relying solely on the "comparable corporation approach" or its position that the value of the stock of the Gus Blass Company fell drastically from the 1916 valuation date to the 1919 valuation date and then dramatically increased by the 1920 valuation date.

At this point the Court incorporates by reference as part of its findings, and as background for further discussion, the statements of fact included in the stipulation filed September 13, 1971, which stipulation sets forth, among other things, agreed reconstructed comparative balance sheets of the Gus Blass Company for the years 1916 through 1921. Those balance sheets reflect that the book value of the common stock as of the end of the calendar year 1916 amounted to $798,828.00; as of the end of 1918, $1,048,463.00; and as of the

end of 1920, $1,216,215.00. The parties generally appeared to agree that the end of the year valuations for 1916 and 1918 were close enough to relate directly to the valuation dates for the "latter part" of the year 1916 and for January 15, 1919. By averaging the year-end book value for 1919 of $1,208,716.00 with the 1920 year-end figure of $1,216,215.00 an "average" book value for July 14, 1920 of $1,212,465.00 was arrived at.

The witness, Mr. Noland Blass, was associated with every phase of the Gus Blass Company business from 1910 until 1950 and served as the president of that company from 1939 until 1950. In 1910 that company operated both a wholesale and retail business. The wholesale business generally used salesmen and dealt in all kinds of piece goods. The retail business dealt in all types of outer and inner apparel for men, women and children and also notions, gloves, handkerchiefs, etc. The wholesale operation occupied quarters across the street from the retail store. Mr. Noland Blass analyzed the profit sheets when he first came with the company and concluded that the wholesale department was losing as much or more as the retail department was making. As a result of this study, it was decided to liquidate the wholesale assets and put these resources into an enlargement of the retail operation. This was accomplished in 1913.

In 1912 the management of the Gus Blass Company decided to build an impressive new building on Main Street in the heart of Little Rock and to bring in "big ticket" departments. Rather than use their own resources, they prevailed upon others to build the building and to lease it to the Gus Blass Company. That building, which was located on the corner of Fourth and Main Streets and had 100 feet of frontage on Main Street, was seven stories in height. The "grand opening" was in October of 1915. The

---

1. The audit, on the basis of which the tax was calculated and paid, placed the value of the common stock, per share, as of the 1916 date at $16.50; the value at the 1919 date at $19.50; and the value at the 1920 date at $27.50.

building completely dominated the downtown area of Little Rock and was one of the largest department store buildings in the Southwest part of the United States. The company was able to negotiate an extremely favorable rental agreement with the owners of the building, to wit, an annual flat rental of $27,400.00 for the entire building. The lease was for 20 years and, the Court finds, this agreement put the company in a very good competitive position because its principal competitors had to pay a percentage of sales with a guaranteed minimum.

Although economic conditions took a relatively drastic turn for the worse with the commencement of World War I in 1914, and its consequent effect upon the cotton economy in the South, conditions began to improve by the latter part of 1915 and in the year 1916.

When the Gus Blass Company decided to enlarge the retail operation and occupy the new quarters, it was necessary to find additional competent personnel. With "big ticket" sales being added and also new departments, it was necessary to find personnel with knowledge about wholly new merchandising areas. After a disastrous fire affecting the Jones House Furnishings Company, the Gus Blass Company bought out that business and Mr. Jones and several of his key personnel joined the Blass operation. The Gus Blass Company also bought Wolff Brothers, which at that time was located on the Southwest corner of Third and Main Streets, and liquidated that business. These steps were taken prior to moving into the new building.

In 1916 the company sold preferred stock in order to obtain additional working capital because, after the two bad years, the company did not have the reserves that it needed. The company got 100 cents on the dollar for the preferred that was sold. $250,000.00 of first preferred was sold, and $50,000.00 of second preferred was acquired primarily by the officers of the company. The preferred was 7½ percent and was callable at $102.00 on any dividend paying date.

The Court finds that, on an overall basis, the prospects for the Gus Blass Company on each of the three valuation dates were very optimistic. The company completely dominated its competition, with sales equaling or exceeding those of its two major competitors combined. It was in a dramatically new and impressive building and had a favorable competitive advantage due to its long-term rental agreement and merchandise buying position. It had established excellent community relations and close financial ties with practically all of the major financial institutions in Arkansas. The liquid position of the company was good and the working capital situation was excellent at all times after the sale of the preferred stock. The company, through its officers and employees, participated in practically all of the civic and charitable campaigns of the community. The company became known to the citizens throughout the state, and its customers were by no means limited to the Little Rock-Pulaski County area. The "goodwill" of the company was excellent.

Although the Court does not know precisely how Mr. Blass arrived at the values stated above, it is clear that, in each instance, he took the average earnings of the company for a certain period of years, determined the interest rates charged on prime commercial paper, and capitalized earnings. It appears that he used 5¼ percent as the prevailing interest rate for each of the three valuation dates.

With respect to the January 15, 1919 value, he took the average earnings for the three years from 1916 through 1918 because he considered those years to be "normal". He did not consider the years 1914 and 1915 because he considered those years not to be "normal". To get the 1916 value, he decided that there was only one "normal" year. In this situation he developed what he considered to be a reasonable formula by averaging the before-tax income for the years 1917 and 1918 with that of 1916.

With respect to the July 14, 1920 valuation, Mr. Blass took the net worth in 1920, deducted the net worth in 1919, and took one-half of the net worth plus one-half of the gain in 1920. Then instead of using three years, he used four and one-half years.

The figures that Mr. Blass arrived at were considerably higher than the figures used by certain members of the family in various estate tax returns.

Although the Court, as indicated above, agrees with Mr. Blass with respect to the outstanding prospects for the Gus Blass Company in the years involved, it does not agree with the results of his method of valuation of the stock.

The Gus Blass Company, at all pertinent times, was a closely held, family controlled corporation. If any purchaser had acquired the stock at issue here on the various valuation dates, that purchaser would have been acquiring only a minority interest and, in evaluating the stock, would have had to take into consideration that "family" considerations might dramatically affect the dividend policy of the company and that other policy agreements, such as those relating to salaries and executive compensation, could even affect the growth prospects of such shares. Furthermore, the Court cannot completely ignore the estate tax valuations placed in evidence or the affidavits of competent people with detailed knowledge of the business which were used for the purpose of sustaining low valuations back during or near the period in question.

In 1964 all stock in the company was sold to an outsider at a price of $77.50 per share. The government inquired of Mr. Blass how the stock could have increased in value so little from his estimates of its value in 1920 and prior years. Mr. Blass strongly responded that, in his opinion, the stock was worth more in 1916 than it was in 1964 and, indeed, there is at least some support for his view in the sense that the prospects and condition of the company in 1964 were not nearly as favorable as they were in the 1916–20 period. By 1964 no dividends were being paid and the liquid position of the company was extremely poor. The accounts receivable were extremely large and the company owed approximately one and one-half million dollars above assets. The competitive position had deteriorated and the cash position was bad.

The government relied upon the testimony of an evaluation analyst whose end product was a report, a summary of which was received in evidence as defendant's Exhibit 4. Essentially Mr. Carrick followed the "comparable corporation approach", using publicly traded companies. He prepared what he considered to be a reasonable geographic dispersion chart and found five companies to be, in his opinion, comparable. The two most important factors considered by him were the earnings and the book value. He related earnings to book value and price to book value.

To decide upon the comparability of the other corporations, he used Moody's, the standard statistical reporting service. The companies chosen by Mr. Carrick are not, in the opinion of the Court, comparable to the Gus Blass Company operation. The Associated Dry Goods Corporation was a holding company which owned six department stores and an unstated amount of real estate. It was incorporated in 1916 and its assets were approximately ten times those of the Gus Blass Company. Sears, Roebuck was also used. At the time Sears had virtually no retail stores. It was almost entirely a mail order house, and the size and scope of its operation bears no relationship at all to the Gus Blass Company. The May Company operated four stores in St. Louis, Denver, Cleveland and Akron. It was growing at an extraordinary rate during the critical period. Its net income increased four and one-half times from 1916 to 1920 and its assets increased two and one-half times. The Mercantile Stores operated stores in Pittsburgh, Wilkes-Barre, Kansas City and Anaconda, Montana. The Kaufmann Company was established in 1871 and

incorporated in 1913. It operated one store in Pittsburgh and on the surface would appear to be the most nearly comparable to the Gus Blass Company. However, while its profits were consistently about eight times those of the Blass Company during the period, its assets were approximately 9.6 times Blass' at the earliest valuation date but just eight times Blass' at the last critical date, indicating that Blass reinvested its profits at a substantially greater percentage than did Kaufmann.

There was no reliable evidence on the part of the government that the actual business of any of the five stores was comparable to the Gus Blass Company. There was no adequate showing as to the types of products that were sold, the size or variety of the various departments of the stores involved, or the competitive position or the future prospects for the stores involved. Despite all of this, the information developed is of some value to the Court in reaching its judgment as to fair market value here.

Capitalization of earnings has to enter into any realistic appraisal of Gus Blass Company stock, but the 5¼ percent interest figure used by Mr. Blass is unreasonable when viewed from the standpoint of a potential buyer or investor. When an investor is buying stock either for income or appreciation, he must consider the risks inherent in that venture when compared with other alternative investments which he might make. For instance, if income is the principal concern, few investors would risk their money in a competitive business for a return of five percent when they can get such a return at no risk from such investments as government bonds. The dividend potential plus the appreciation potential for any particular stock will usually be compared by a buyer with the return or appreciation prospects of other investments, such as real estate, or real estate mortgages, bonds, etc.

The Court has analyzed all the factors referred to in Section 4.01 of Revenue Ruling 59–60. It is of the opinion that book value in a case such as this bears little relation to market value although the increases in book value do reveal the trend in successful operation of the business. In addition, the Court is of the opinion that the earning record and the earning capacity of the company are very important in the case of a closely held corporation, whereas the dividend paying record may not be a reliable index. There were no sales of the common stock of the Gus Blass Company at any time pertinent to this litigation, and the Court is of the opinion that it had before it no evidence of the selling price of stock in truly comparable business operations.

Although any retail business bears considerable risk, the Gus Blass Company during the period under consideration had a favorable financial condition, favorable prospects, an excellent competitive position, and established goodwill, and therefore such risks were minimized.

The Court feels that capitalization of earnings is an important factor in arriving at the true valuation of the stock and is of the opinion that the capitalization return of somewhere between nine and twelve percent would not be unreasonable under the facts of this case. However, in arriving at its findings as to value below, the Court has not relied solely upon capitalization of earnings, but has taken into consideration not only the favorable circumstances affecting the business but also the unfavorable circumstances which could attend the purchase of a minority interest in such stock at the pertinent times.

The government has contended in its argument that the regulations create a presumption that estate tax values are correct and that rebuttal evidence must be strong and convincing. Here, the evidence is not only strong and convincing but the government itself abandoned such values after noting errors therein.

It should also be noted that the stipulation, which the defendant entered into, shows that it agrees that the net profits

of the company were entirely different for the years involved than as actually set forth in the various "ancient document" affidavits entered into evidence.

The Court has considered not only the factors referred to above but also the sales figures for the company and an analysis of the price-earnings ratios.

The Court, after weighing and balancing all pertinent factors, finds that the fair market value per share of the common stock of the Gus Blass Company as of the latter part of 1916 amounted to $28.50; as of January 15, 1919, amounted to $31.50; and as of July 14, 1920, amounted to $38.50.

The parties will apply these factual determinations and the defendant will make refunds accordingly.